UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 567-1 |
| vs. | ) | Judge Ronald A. Guzman |
| | ) | |
| WILLIAM MASTRO | ) | |

**GOVERNMENT'S MEMORANDUM IN
SUPPORT OF THE PROPOSED PLEA AGREEMENT**

The UNITED STATES OF AMERICA, by GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, submits this memorandum in support of the proposed plea agreement.

## I. Introduction

The grand jury charged defendant William Mastro, and co-defendants Doug Allen and Mark Theotikos with mail and wire fraud related to Mastro Auctions, an online auction house. The indictment also charged William Boehm with lying to FBI agents about the existence of the scheme.

On February 12, 2013, the government, defendant and his attorneys appeared before the Court for a change of plea hearing. Prior to the scheduled change of plea hearing, the government provided the Court with a copy of the proposed plea agreement for its consideration. The proposed plea agreement is governed in part by Rule 11(c)(1)(C) and, among other agreements related to sentencing, provides for a sentence that will not include a term of imprisonment in the custody of the Bureau of Prisons that is greater than 30 months.

1

Upon its review of the proposed agreement, the Court questioned the parties regarding the agreement's 30-month cap. The Court noted that there was an eight-level difference between the parties' respective sentencing guideline calculations, and wondered how the parties reached the agreed sentencing range. The Court also noted that unlike other agreements frequently made pursuant to Rule 11(c)(1)(C), this agreement did not contain a cooperation agreement. The Court asked the government to identify the benefits it received in exchange for reducing the maximum sentence that could be imposed on the defendant.

As explained below, the government submits that the proposed plea agreement provides for a sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing pursuant to 18 U.S.C. § 3553. First, the parties' dispute over the proper calculation of loss under the sentencing guidelines revealed significant uncertainty over the correct methodology to employ in this case. The proposed, agreed maximum sentence is within the guidelines as calculated by defendant, and the government believed that its loss calculation, while likely correct, ought not to be the determinative factor in the sentence. Second, the government received significant concessions from the defendant, leading it to conclude that lowering the maximum penalty would be appropriate in this case. The defendant agreed to be interviewed by the government, and pursuant to a proffer agreement, provided valuable information concerning the nature and extent of his conduct. While not rising to the level of substantial assistance in the prosecution of another, the defendant's proffer provided a benefit to the government, one that should be reflected in the sentence imposed by

the court. Defendant's admissions in the proposed plea agreement provide a strong deterrent message to others in this industry, which was an additional benefit to the government in this case. The government also took into account mitigating circumstances presented by the defendant when arriving at the sentencing agreement. For these reasons, the government requests that this Court accept the plea agreement proposed by the parties, or in the alternative, conduct the Rule 11 colloquy and defer acceptance of the agreement until sentencing.

## II. Sentencing Guideline Calculations

In the proposed plea agreement, the parties are in agreement with respect to all guidelines calculations, except with respect to loss amount pursuant to USSG § 2B1.1. As set forth in the indictment and the proposed factual basis to defendant's guilty plea, the scheme to defraud in this case involves the manipulation of auctions in an effort to drive up the sale price of items, or prevent the sale of items at a price less favorable to the consignor of the item. For example, "shill bids" were bids submitted under fraudulent pretenses without an intent to be a true winning bid, but instead designed to stimulate others to bid on the item. Many auctions involved multiple true bidders and a winning bid by an auction customer who was willing to pay the final sales price for the item. Determining the loss for purposes of the guidelines was a complicated endeavor, requiring a lot-by-lot, bid-by-bid analysis of tens of thousands of records. In arriving at the agreed upon maximum sentence, the government considered the uncertainty inherent in its calculation, along with defendant's concession that there were more than 50 victims, defendant had an aggravated role in the offense as the

organizer or leader of the scheme, and the loss was at least more than $30,000. Defendant's concessions were equivalent to a guideline range of 27 to 33 months' imprisonment, and the proposed plea agreement provides for a maximum sentence within that range.

 A. <u>Guidelines Agreed Upon by the Parties</u>

The parties agreed upon the following guidelines calculations:

  i. Pursuant to Guideline §2B1.1(a)(1), the base offense level is 7.

  ii. Pursuant to Guideline §2B1.1(b)(2)(B), the offense level is increased four levels because the offense involved 50 or more victims, but less than 250 victims.[1]

  iii. Pursuant to Guideline §3B1.1(a), the offense level is increased four levels because defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

 B. <u>Disputed Guidelines</u>

As this Court has already noted, there is an eight-level discrepancy in the parties' calculations of loss amount. The proposed plea agreement specifically acknowledges that "there are alternative and reasonable methodologies for the calculation of loss." The government has taken the position that the offense level is increased 14 levels pursuant to Guideline §2B1.1(b)(1)(G) because the loss is more than

---

[1] Despite the number of years of fraud and the number of fictitious bids placed, it was frequently the case that a shill bidder was the highest bidder on an item and "won" the lot. In such cases, the sale of the lot was cancelled and the item was returned to Mastro Auctions' inventory, defendant, or the consignor of the item. Under the guidelines, there was no victim in these instances. Guideline §2B1.1, Application Note 1.

4

$400,000 but less than $1,000,000. According to the defendant's theory of loss, pursuant to Guideline §2B1.1(b)(1)(D), the offense level is increased 6 levels because the loss is more than $30,000, but less than $70,000.

While the parties' positions with respect to loss vary, the parties are in agreement that there is little precedent available for calculating loss amount stemming from the types of auction practices charged in the indictment. Before agreeing to the terms of the proposed plea, the government considered various alternative methods for calculating loss amount.

By way of background, each auction typically had an average of 1500-2000 lots. A single lot could have multiple bids–ranging from approximately ten to fifty bids–depending on the lot and interest in it. The bidding records for a particular auction consisted of hundreds to thousands of pages of bids, with each page containing 49 bids.

In determining the appropriate loss amount, the government, as a preliminary matter identified lots in which shill bidding was present. Lots with fictitious bidding were identified based on the following: (i) the existence of known "shill pairings," meaning that the lot was consigned by an individual consignor and contained bids placed using an account of a nominee associated with the consignor; (ii) the account used to place the bid was in the name of a fictitious individual; (iii) the account used to place the bid was one the investigation showed was used for shill bidding; (iv) defendant placed bids on an item which he, in fact, owned or was owned by the Auction House.

*1. Government's Theories for Calculating Loss*

Once the government identified lots in which fictitious bidding was present, it considered various formulas to calculate actual and intended loss as it pertained to shill bidding. One scenario was where a shill bidder was solely responsible for causing one legitimate bidder to pay a higher price for the item. In that straightforward example, where the shill bidder "runs up" a legitimate bidder, the loss amount is readily calculated as the difference between the last legitimate bid placed before the shill bid and the final price the legitimate bidder paid for the item. This is illustrated by the following example:

| | |
|---|---|
| Legitimate Bidder #1 | 100 |
| Shill Bid #1 | 125 |
| Legitimate Bidder #1 | 150 |
| Shill Bid #2 | 175 |
| Legitimate Bidder #1 | 200 |
| Shill Bid #3 | 225 |
| Legitimate Bidder #1 | 250 (winning bid) |

The winning bid in this case is $250. But for the shill bids, the legitimate bidder should have won the item at $100. Under this scenario, the government calculated the loss amount as $150, i.e., the loss is equal to the difference between the winning bid and first legitimate bid at which the item should have been won.

This, however, was not the typical scenario. Often times, multiple legitimate bidders placed bids on a particular item. At the same time, shill bids were intermittently placed throughout the bidding process and intermixed with the legitimate bidders. In these more complicated, yet common, scenarios, the government's position is that the loss is the difference between each shill bid and the

6

subsequent legitimate bid. This loss is justified because at the time the shill bid was placed, the shill intended to drive up the price of the last legitimate bidder in that amount. According to the government's theory of loss, this formula appropriately recognizes that the market later yielded a higher legitimate bid, and does not hold defendant liable for that legitimate market increase. The following is an illustration of this more complicated, but common, situation:

| | |
|---|---|
| Legitimate Bidder #1 | 100 |
| Shill Bidder #1 | 125 |
| Legitimate Bidder #2 | 150 |
| Shill Bidder #2 | 175 |
| Legitimate Bidder #3 | 200 |
| Shill Bidder #3 | 225 |
| Legitimate Bidder #4 | 250 (winning bid) |

In this instance, the government considered the shill bidder's intentions at the time the fictitious bid was placed. Under this theory, Shill Bidder #1 had the intent to defraud Legitimate Bidder #1, the previous bidder, when he placed the bid. At the time Shill Bidder #1 placed the bid, he had no knowledge that Legitimate Bidder #2 would outbid him. Shill Bidder #1, however, had the intent to drive up the price Legitimate Bidder #1 would pay for the item. The intended loss for that particular bid was $25 (125-100). Continuing with this valuation of loss, Shill Bidder #2 intended to drive up the price Legitimate Bidder #2 would pay for the lot at the time Shill Bidder #2 placed his bid. This adds another $25 to the intended loss for this lot (175-150 = 25). Finally, under this scenario, Shill Bidder #3 intended to drive up Legitimate Bidder #3 when he placed his bid of $225. At the time Shill Bidder #3 bid, he intended to drive up the

price despite the intervening bid placed by Legitimate Bidder #4. Thus, in total, the loss amount for this scenario is $75.

Still, there were other shill bidding scenarios. Another example is the situation where shills bids were placed following bids placed by multiple legitimate bidders. As the cost of the item increased, a sole legitimate bidder and shill bidder remained. This scenario is depicted as follows:

```
Legitimate Bidder #1        100
Shill Bid #1                200
Legitimate Bidder #2        300
Shill Bid #2                400
Legitimate Bidder #3        500
Shill Bid #3                600
Legitimate Bidder #1        700
Shill Bid #4                800
Legitimate Bidder #1        900
Shill Bid #5                1000
Legitimate Bidder #1        1100   (winning bid)
```

In the scenario above, the government calculated loss amount to be $700. This number was determined according to the following formula:

[SB1 - LB1] + [SB2-LB2] + [SB3-LB3] + [winning bid - what should have been the winning bid] = Loss Amount

The following illustrates an actual application of this formula based on the preceding scenario.

[200-100] + [400-300] + [600-500] + [1100-700] = $700

Finally, there is another possible scenario reflected in the bidding records. This scenario contemplates a lot where shill bids, legitimate bids and a fraudulent hidden reserve were all present.

| | |
|---|---|
| Legitimate Bidder #1 | 100 |
| Legitimate Bidder #2 | 200 |
| Legitimate Bidder #3 | 300 |
| Shill Bid #1 | 400 |
| Legitimate Bidder #1 | 500 |
| Legitimate Bidder #2 | 600 |
| Legitimate Bidder #3 | 700 |
| Shill Bid #2 | 800 |
| Legitimate Bidder #1 | 900 |
| Fraudulent Reserve | 1000 (winning bid) |

Again, focusing on the intended loss at the time that the shill bid was placed, the government derived a formula for calculating loss. Under this scenario, the intended loss is $300. This was calculated as follows:

[SB1-LB3] + [SB2-LB3] + [Fraudulent Reserve-LB1]= Loss Amount

Specifically, this formula was applied as follows:

[400-300] + [800-700] + [1000-900]= $300

Another variation of shill bidding charged in the indictment was the setting of a fraudulent reserve or ceiling bid, early in the auction, which, in effect, was a shill bid. In those instances where the fraudulent reserve was not met, and the last legitimate bidder did not actually win the item, the loss amount (or gain to defendant) was determined based on the difference between the fraudulent reserve amount and final legitimate bid. This is illustrated as follows:

| | |
|---|---|
| Legitimate Bidder #1 | 100 |
| Legitimate Bidder #2 | 150 |
| Legitimate Bidder #1 | 200 |
| Legitimate Bidder #3 | 250 |
| Fraudulent Reserve | 300 |

Under this scenario, the gain to the defendant was $50. This was calculated as follows:

    Fraudulent Reserve-Final Legitimate Bid = Gain to Defendant, or
    300-250 = $50

When this occurred during the scheme, the item was returned to inventory or its original consignor. The government calculates a loss of $50 because but for the fictitious reserve (the ceiling bid), Legitimate Bidder #3 would have won the item for $250.[2]

### 2. *Calculation of Loss Amount Attributed to William Mastro*

After deriving formulas for calculating loss under the various auction scenarios, the government reviewed bidding records for each auction where the government had evidence of defendant's participation in the scheme. As already noted, an auction typically had an average of 1500-2000 lots. Bidding on each of the lots varied, but it was not uncommon to see a range between 10 and 50 bids per lot. The government identified the lots in which shill bidding was believed to be present, applied one of the formulas set forth above, and determined a preliminary loss figure. Using the formulas set forth above and available bidding records,[3] the government estimated a loss amount of more than $400,000, but less than $1,000,000.

---

[2] It is the defendant's position that in such circumstances there is no loss.

[3] Underbidder records, referring to all records of bids placed on a given lot which preceded the winning bid, were not available during certain time periods. Accordingly, where possible, the government estimated loss when complete records were unavailable.

      3.  *Defendant's Challenges to the Government's Loss Theory*

As previously stated, and recognized by both parties, there are alternative methodologies for calculating loss. Indeed, the calculation of loss, based on the facts of this case, is novel. The government believes its theory for calculating loss to be appropriate, but it is admittedly subject to debate. Defendant has challenged many of the lots the government identified as containing fraudulent bidding arguing that, at times, he bid on an item because he legitimately wanted the item, and therefore, there was no intent to defraud for that particular auction. According to defendant, because the bid was legitimate, it should not be included in any loss calculation.

It would require a tremendous amount of the Court's and the parties' resources to establish defendant's intent with respect to literally thousands of items. In the proposed plea agreement, the parties stipulate that defendant committed fraud with respect to many bids, but in exchange for an agreed maximum sentence, forgo the necessity of litigating exactly how many times he committed that fraud. This was a significant benefit to the government.

Even assuming the parties were in agreement on which lots contained fraudulent bids, defendant raised a series of other arguments relating to the calculation of loss, including:

- There is no loss incurred when an item is returned to its original consignor or the auction house won the items.

- Reserves, hidden or otherwise, are an acceptable practice in the auction industry.

11

- Many potential bidders knew or should have known that shill bidding was present in the auction, but were willing to pay an inflated value of an item in order to own it. In such instances, there was no fraud.

- In instances where the bidding far exceeded the last shill bid, there was no harm or loss incurred. Instead, the item went for its fair market value.

- The value of the item won and purchased has since increased. As such, there is no loss to the winning bidder.

The government did not agree with the defendant's arguments. Nevertheless, it recognized the potential for extensive hearings on the different theories of loss calculation based on the facts of this case and took into account other sentencing factors, as set forth in 18 U.S.C. § 3553(a) and discussed in greater detail below. As a result, the parties fashioned an agreement which recognized that loss was a highly contestable figure and attempted to avoid an unnecessary, prolonged hearing.[4]

Given the uncertainty in measuring loss in this particular case, the government also concluded that its loss calculation was not necessarily the most accurate measure of the harm caused by the crime. From the perspective of § 3553(a)'s requirement to consider the nature and circumstances of the offense, the government took a holistic approach to fashioning its sentencing agreement with the defendant (particularly when coupled with other concessions made by the defendant discussed below), without being rigidly wed to the guidelines.

---

[4] Similarly, defendant's agreement to waive appellate and collateral attack rights in the proposed plea agreement was a concession for which the government was prepared to offer consideration (namely, an agreed, reduced maximum sentence).

**III.     Other Factors Support Acceptance of the Proposed Plea Agreement**

In addition to the uncertainty inherent in the loss calculation (and the corresponding difficulty in using the government's guidelines calculation as a proxy for a complete § 3553(a) analysis), the government considered the concessions made by the defendant in exchange for a favorable sentencing agreement. Defendant's proffer, waiver of the statute of limitations and proposed confession to fraud in the plea agreement, provide value to the government in its pursuit of fraudulent auction practices in this industry–value that should be taken into account at sentencing.

A.     Defendant's Proffer

Defendant did not agree to testify on behalf of the government. Thus, he has not provided substantial assistance to the government in the prosecution of another. While defendant declined to provide such assistance, he agreed to be interviewed pursuant to a proffer agreement.[5] The scope of the proffer was limited by defense counsel (thereby detracting from its value to the government), but the proffer was useful to the government in that it addressed various aspects of the extensive fraud. The proposed sentencing agreement is intended to reflect that value.

In his proffer, defendant candidly spoke of the following: (i) his use of various accounts to place shill bids often triggering ceiling bids to which he had access; (ii) having facilitated certain consignor's use of shill accounts; (iii) engaging in conduct

---

[5]The government is disclosing this information with the permission of defense counsel. Upon request, the government will provide a copy of the report of defendant's proffer to the Court to review *in camera*, subject to the terms of the proffer agreement and USSG § 1B1.8.

13

contrary to the terms of the Mastro Auctions Code of Conduct; (iv) knowingly failing to disclose laboratory results to Victim C.L. when he sold him a trophy ball; and (v) having cut the sides of the T206 Honus Wagner card despite prior statements to the contrary. Defendant further admitted that his conduct, at times, deceived legitimate bidders who believed that they were bidding against other legitimate bidders, and not the auction house. He further admitted that as a result of his conduct, bidders, at times, paid more than what they should have for an item.

The proffer was significant, not only because of its admissions, but because defendant's information solidified the government's theories of the case and undermined potential defenses of co-defendants. For example, based on statements made by defendant, information provided by another individual was directly contradicted. This was meaningful in that the government was able to confirm that the individual lied to FBI agents investigating the fraudulent scheme.

B.     Statute of Limitations Waiver and Defendant's Factual Basis

The government also placed value on defendant's willingness to waive the statute of limitations with respect to conduct that would not otherwise have been charged. This was not because the government did not have within-statute counts available to it. Instead, the waiver allowed the government to charge an execution of the scheme involving some of defendant's more egregious conduct, namely, the creation of an account by co-defendant Boehm, which was used solely to place fictitious bids. This was one of the more blatant forms of shill bidding engaged in by defendant.

A public charge involving this conduct, and defendant's proposed admission to this conduct, is valuable to the government because it sends a deterrent message to others in the auction industry. As noted below, significant prosecutions in closely-watched, insular industries have value to the overall law enforcement mission of the government. Defendant's proposed factual basis therefore aids the government in its prosecutions, and the parties' sentencing agreement was designed, in part, to take this additional factor into account.

C.  Application of Factors Set Forth in 18 U.S.C. § 3553

Pursuant to § 3553, the "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Towards that end, the government attempted to present an acceptable plea agreement to this Court which took into account the various sentencing factors.

Defendant has consistently maintained that this case is the first of its kind in that an auction house's employees have never been held criminally liable for the type of bidding practices engaged in by defendant. From the government's perspective, defendant and his co-defendants participated in a scheme to defraud Mastro Auctions customers, and to obtain money by materially false representations and omissions. In that regard, the facts of this particular scheme are perhaps novel, but the crime itself is not.[6] Nevertheless, the prosecution of fraudulent bidding practices, coupled with a

---

[6] If this Court accepts the proposed plea agreement, the government will recommend a sentence of imprisonment no greater than 30 months. In support of its request for a sentence of imprisonment, the government will discuss the various §3553 factors, including the seriousness of the offense. At sentencing, the government will

potentially meaningful prison sentence for a defendant like Mastro,[7] should send a strong message of deterrence to others in the auction and collectibles industry. Through this prosecution, the government hopes to deter other auction houses, auction employees and auction participants, who may be engaging in similar conduct, to immediately cease their unlawful practices before they, too, face criminal liability.

If defendant prevailed on his theory of loss calculation, the advisory sentencing guidelines range is 27-33 months' imprisonment. The proposed cap of 30 months imprisonment is within that range, and therefore would not create unwarranted disparities across similarly situated defendants.

## IV. Conclusion

The proposed plea agreement contains concessions by the defendant that benefit the government in its prosecutions of cases like this one, and that are relevant to a determination of the proper sentence to impose in this particular case. At this stage of the proceedings, prior to the preparation of the Presentence Investigation Report, the

---

address the scope and length of the fraud, defendant's role in the fraud, and the crime's impact on victims and the public at large.

[7] In considering what might constitute a sufficient, but not greater than necessary term of imprisonment, the government also considered mitigating evidence presented by defense counsel concerning Mastro's character. This included information about Mastro's personal and family history, and conduct that was unrelated to the offense but provided insight into the government's assessment Mastro's risk to recidivate. The government expects defense counsel to present this information to the Court at sentencing, in the event the Court accepts the proposed plea agreement. The government's assessment however, was that a below-guidelines sentence (assuming the correctness of the government's calculation) would be appropriate.

parties admittedly have more information than the Court concerning the facts and circumstances of the case. As explained above, however, the agreement reached by the parties factors: (1) the uncertainty inherent in reaching an accurate guidelines calculation, (2) the assistance to the government from defendant's proffer, statute waiver, and proposed public admissions, and (3) the deterrent effect (tempered by individual mitigating circumstances). For these reasons, the government respectfully requests that the Court accept the agreement of the parties, or in the alternative, conduct the Rule 11 colloquy and defer acceptance until it has reviewed the Presentence Investigation Report and the sentencing memoranda of the parties.

        Respectfully submitted,

        GARY S. SHAPIRO
        United States Attorney

By:   /s/ Nancy DePodesta
        NANCY DEPODESTA
        Assistant United States Attorney