FILED

OCT - 7 2013

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 12 CR 567  JUDGE RONALD GUZMAN |
| v. | Violation: Title 18, United States Code, Section 1341 |
| WILLIAM MASTRO | Superseding Information  MAGISTRATE JUDGE GILBERT |

The UNITED STATES ATTORNEY charges:

1. At times material to this superseding information:

   a. Mastro Auctions, which previously operated under the names Mastro Fine Sports and Mastro Net (collectively referred to as "Mastro Auctions"), was an auction house that specialized in sports memorabilia and Americana items, but also featured items such as coins, art, and other collectibles in its auctions. Most items sold through Mastro Auctions were consigned to Mastro Auctions for sale by their owners, but at times Mastro Auctions sold items owned by Mastro Auctions. Mastro Auctions advertised itself as the "world's leading Sports and Americana auction house" with "an established history of setting auction records and bringing the best collectibles to public auction."

   b. Between 2001 and February 2009, Mastro Auctions' main offices were located, at different times, in various suburbs in the Northern District of Illinois, including Oak Brook, Willowbrook, and Burr Ridge.

c. Mastro Auctions held auctions several times each year. Mastro Auctions primarily conducted online auctions, but at times conducted live auctions. Mastro Auctions advertised itself as "an industry innovator" for online auctions.

d. Prior to each auction, Mastro Auctions' employees obtained consignments from individuals who wished to sell their items in Mastro Auctions' auctions. Consignors typically were required to pay a fee to Mastro Auctions for selling their items. This fee usually was a percentage of the price that an item sold for at auction, and was referred to as a "seller's fee" or a "commission." Mastro Auctions often entered into consignment agreements with consignors.

e. In order to be granted bidding privileges in certain Mastro Auctions' auctions, potential bidders were required to pay a fee. Once a potential bidder paid a one-time $75 fee to Mastro Auctions, the bidder was permitted to place bids in future auctions.

f. Prior to each auction, Mastro Auctions produced catalogs which depicted and described the items consigned for sale in the auction.

i. In each auction catalog, Mastro Auctions set out "Terms and Conditions of Sale," along with other representations, which governed the auctions. Each Mastro Auctions catalog stated that "placing a bid constitutes express acceptance of all terms and provisions contained in these conditions of sale."

ii. Catalogs for each auction were delivered to potential bidders via the United States mail, United Parcel Service, and/or Federal Express.

2

g. During Mastro Auctions' online auctions, bidders placed bids online, though Mastro Auctions' website, or by directly communicating with a Mastro Auctions employee, typically by telephone or facsimile.

i. Bidders were able to place either a "straight bid" or a "ceiling bid." A straight bid represented a bid at the next incremental value above the last bid on a particular item up for auction. By placing a ceiling bid, the bidder, in effect, instructed Mastro Auctions to competitively bid, according to established increments, on the bidder's behalf until the ceiling bid value was reached.

ii. The value of the highest bid for each lot at the close of the auction was referred to by Mastro Auctions as the "hammer price."

iii. In order to purchase an item, winning bidders were required to pay Mastro Auctions a fee, called a "buyer's premium," in addition to the hammer price. The buyer's premium was calculated as a percentage of the hammer price, and ranged between approximately 15% to 22% of the hammer price.

h. Many Mastro Auctions customers were active traders of the categories of collectibles sold through Mastro Auctions, and at various times were both bidders on and consignors of items through Mastro Auctions.

i. "Shill bids" were fictitious bids placed without the intent to win the item, but for the purpose of artificially inflating the price of an item in the auction.

3

## Defendant and Co-schemers

2. Defendant WILLIAM MASTRO was the owner of Mastro Auctions until approximately 2004. Between approximately 1996 and February 2009, MASTRO served as the Chairman and Chief Executive Officer of Mastro Auctions.

3. Between approximately 2001 and February 2009, DOUG ALLEN served as the President and Chief Operating Officer of Mastro Auctions.

4. Between approximately 1996 and February 2009, MARK THEOTIKOS was employed by Mastro Auctions, serving as the Vice President of Auction Operations and later as the Vice President of Acquisitions.

5. Co-Schemer A was employed by Mastro Auctions and was responsible for reconciling the accounting records following each auction.

## The Scheme to Defraud

6. Beginning no later than in or about 2001 and continuing until approximately February 2009, at Oak Brook, Willowbrook, and Burr Ridge, in the Northern District of Illinois, Eastern Division, and elsewhere:

WILLIAM MASTRO,

defendant herein, along with DOUG ALLEN, MARK THEOTIKOS, Co-Schemer A, certain consignors, other auction house employees, and others known and unknown, knowingly devised and intended to devise, and participated in, a scheme and artifice to defraud the customers of Mastro Auctions, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

4

promises and the concealment of material facts, which scheme is further described below.

## Overview of the Scheme

7. It was part of the scheme that defendant MASTRO, DOUG ALLEN, MARK THEOTIKOS, and their co-schemers knowingly made, and caused to be made, materially false and fraudulent representations and concealed material facts in Mastro Auctions' catalogs, advertising, promotions, and other media, and in the bids placed in certain auctions. The defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers intended to deceive bidders into believing that Mastro Auctions conducted auctions according to practices that ensured fair and competitive auctions and that applied equally to all auction participants, and further intended to deceive auction participants into believing that greater market demand existed for items sold by Mastro Auctions than actually was the case. In fact, defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers engaged in a series of practices designed to fraudulently inflate prices paid by bidders and protect the interests of consignors and sellers at the expense of bidders. In addition, defendant MASTRO and ALLEN caused the sale of certain items whose authenticity and condition they knew to have been misrepresented to customers.

## Materially False and Fraudulent
## Representations Regarding Conduct of Auctions

8. It was further part of the scheme that defendant MASTRO, ALLEN and THEOTIKOS made, and caused to be made, the following materially false and fraudulent statements, among others, regarding the manner in which Mastro Auctions' auctions were conducted:

a. Each Mastro Auctions catalog represented that "items are sold to the highest bidder." In fact, as defendant MASTRO, ALLEN, and THEOTIKOS knew, certain items were not sold to the highest bidder because defendant MASTRO, ALLEN, and THEOTIKOS canceled sales and engaged in and facilitated shill bidding to fraudulently inflate prices to the detriment of bidders.

b. Consignment agreements entered into by consignors and Mastro Auctions stated that a consignor, or agent of the consignor, was prohibited from bidding on an item tendered to Mastro Auctions by the consignor. The consignment agreements stated that if the consignor violated this provision and had the highest bid on an item or lot, the consignor would be required to pay Mastro Auctions the commission and buyer's premium on the item or lot upon which the consignor was the highest bidder. The consignment agreements further stated that there were no exceptions to this provision. In fact, as defendant MASTRO, ALLEN, and THEOTIKOS knew, defendant MASTRO, ALLEN, and THEOTIKOS knowingly

permitted certain consignors to bid on their own items, and at times those consignors did not pay commissions or premiums when they placed the highest bid.

      c.    Mastro Auctions catalogs, defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers, represented at various times that Mastro Auctions did not implement undisclosed "reserves," meaning prices, not disclosed to bidders, at which Mastro Auctions would not sell an item if the bidding failed to reach the "reserve" price. In fact, in certain auctions, defendant MASTRO, ALLEN, and THEOTIKOS canceled sales instead of allowing the highest bidder to purchase an item, in order to prevent the consignor from selling the item at a price lower than the consignor desired. The false statements about "reserves" included:

      i.    Mastro Auctions' catalogs for auctions held in October 2004, February 2005, June 2005, October 2005, February 2006, June 2006, October 2006, February 2007, June 2007, and October 2007, stated that these auctions were "NO RESERVE" auctions;

      ii.    No later than August 2007, Mastro Auctions made, and caused to be made, a promotional video advertising Mastro Auctions' 2007 live auction event in Cleveland, Ohio. In the promotional video, ALLEN represented that items in the auction were going to sell "without reserve, the way we have conducted every Mastro Auction since our inception;" and

    iii. Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers told, and directed others to tell, consignors, bidders, and potential customers that Mastro Auctions conducted "no reserve" auctions.

  d. On or about February 24, 2008, ALLEN posted a statement on an Internet website frequented by consignors and bidders of Mastro Auctions in which he represented that:

    i. Mastro Auctions had never instituted a reserve when selling a sports card or sports memorabilia;

    ii. When an associate of a consignor won an item because of a shill bid, that person paid the buyer's premium similar to other customers;

    iii. ALLEN was not aware of Mastro Auctions having returned an item to a consignor after a bid was accepted in an auction; and

    iv. If a consignor had a [baseball] card returned following an auction, the consignor paid the buyer's premium and did not get an advantage over another bidder. In fact, as ALLEN knew, certain consignors and shill bidders won items and the sales were canceled at ALLEN's direction and returned to the consignor, at times without the payment of fees.

  e. In approximately October 2007, ALLEN created, and caused to be created, a "Code of Conduct" for Mastro Auctions, which defendant MASTRO, ALLEN and THEOTIKOS caused to be distributed to bidders, including in the

October 2007 Mastro Auctions' Classic Collector Auction catalog. The Code of Conduct stated, in part, that:

    i.    Mastro Auctions would disclose in its catalogs which items were owned by Mastro Auctions' employees, authenticators, the corporate entity, and other third party affiliates;

    ii.    With the exception of one designated administrative employee, who would not be allowed to bid in the auction, Mastro Auctions' employees did not have access to ceiling bids;

    iii.    "Related parties," considered to be Auction House employees, the corporate entity, and all third party affiliates (authenticators, service providers, etc.), were prohibited from bidding on each other's consigned items. In fact, as defendant MASTRO, ALLEN, and THEOTIKOS knew, after October 2007, Mastro Auctions frequently did not disclose true ownership of items, several employees with bidding privileges (including defendant MASTRO and ALLEN) had access to ceiling bids, and employees (including defendant MASTRO and ALLEN) bid on items consigned by related parties.

### Fraudulent Auction Practices

9.    It was further part of the scheme that, contrary to the representations described above regarding practices that purportedly ensured that auctions conducted by Mastro Auctions would be conducted fairly for bidders, and that bidders would have a chance to obtain auction items at competitive market prices,

defendant MASTRO, ALLEN, and THEOTIKOS knowingly engaged in the following practices and took the following actions, among others, to cause bidders in certain auctions to pay inflated prices and to protect the interests of consignors and sellers at the expense of bidders:

    a.    Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers placed, and caused to be placed, shill bids for the purpose of artificially inflating the price of an item in the auction;

    b.    Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers placed, and caused to be placed, shill bids using bidding accounts that were not registered to the person placing the bid;

    c.    Defendant MASTRO used a bidding account in the name of a fictitious individual to place shill bids;

    d.    Defendant MASTRO, ALLEN, and THEOTIKOS placed, and caused to be placed, shill bids using Mastro Auctions' corporate bidding account, their own personal accounts, and accounts of employees and friends. For example:

        i.    Beginning no later than in or about 2001 and continuing until at least in or about December 2008, defendant MASTRO placed shill bids, and caused others to place shill bids, using several accounts, including defendant MASTRO's account, a fictitious account, Mastro Auctions' corporate bidding account, employee accounts, and accounts in the names of defendant MASTRO's family members, a priest, and others.

ii. Beginning no later than in or about 2001 and continuing until at least in or about February 2009, ALLEN placed and caused others to place shill bids, using several accounts, including ALLEN's account, Mastro Auctions' corporate bidding account, the accounts of Owner A, and others.

iii. Beginning no later than in or about 2007 and continuing until in or about February 2009, THEOTIKOS placed shill bids using Mastro Auctions' corporate bidding account.

e. Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers ensured that when a shill bid was the highest bid at the end of an auction, that item would not be purchased by the shill bidder. Instead, defendant MASTRO, ALLEN, THEOTIKOS and their co-schemers canceled the sale of the item or offered it to the next-highest bidder.

f. Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers knowingly permitted certain consignors to place bids on the consignors' own items, using shill bidding accounts belonging to nominees of these consignors to fraudulently inflate the sale price of those items.

g. Defendant MASTRO, ALLEN, and THEOTIKOS facilitated certain consignors' use of shill bids by taking the following actions, among others, when a consignor's shill bid was the winning bid for an item:

11

        i.      Directing Mastro Auctions employees to return the auction item to the consignor, rather than delivering it to the consignor's nominee who had "won" the auction;

        ii.     At times waiving any fees due to Mastro Auctions, including the hammer price, buyer's premium, and seller's fee; and

        iii.    When fees were imposed, causing the consignors, not the consignor's nominees in whose names the winning bids were submitted, to pay the fees associated with the transaction, and directing Mastro Auctions employees, including Co-Schemer A, to modify Mastro Auctions' records to charge the consignor, not the consignor's nominee, with fees associated with the purported sale of the auction item.

     h.    Defendant MASTRO, ALLEN, their co-schemers, Mastro Auctions' employees, and others had access to ceiling bid information, despite representations made in the Code of Conduct that only one "administrative employee" had access to ceiling bid information.

        i.      Defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers used, and caused others to use, information about the ceiling bids of certain customers to drive up the bids of those customers, by causing bids to be placed below the customers' ceiling bids, knowing full well that defendant MASTRO's, ALLEN's, and THEOTIKOS's bids would be topped and they would not be the high bidder on an item because the bidding system automatically executed a

12

bid on behalf of the legitimate bidder, who had placed a ceiling bid, up to the set amount.

j.  Defendant MASTRO, ALLEN, THEOTIKOS and their co-schemers caused Mastro Auctions to decline to sell items to winning bidders in auctions in which Mastro Auctions had represented that there were no reserves. After such auctions closed, defendant MASTRO, ALLEN, and THEOTIKOS directed Co-Schemer A to adjust Mastro Auctions' internal records to reflect that the sale was a "no sale" or had been canceled. In some instances, defendant MASTRO, ALLEN, and THEOTIKOS caused the auction items to be returned to the consignor without charging any fees. Other times, defendant MASTRO, ALLEN, and THEOTIKOS caused the items to be placed in later auctions.

k.  After the Code of Conduct was published, defendant MASTRO, ALLEN, and THEOTIKOS failed to disclose that Mastro Auctions owned certain lots offered for sale in Mastro Auctions' auctions.

l.  After the Code of Conduct was published, defendant MASTRO, ALLEN, and THEOTIKOS placed bids, and caused other Mastro Auctions employees to place bids, on auction items owned by Mastro Auctions.

**False Representations Regarding Authenticity and Condition of Items**

10. It was further part of the scheme that:

a.  The Code of Conduct promulgated by in 2007 made the following representations, among others, regarding Mastro Auctions' practices concerning

13

disclosure of information that items sold at its auctions had been altered or restored:

        i.     If Mastro Auctions believed or had knowledge that an item has been altered in any way, that information would be fully disclosed in the auction catalog.

        ii.    When, on occasion, Mastro Auctions had items restored in order to improve their presentation, the extent and nature of any restoration would be fully disclosed.

        iii.   Under no circumstances would Mastro Auctions have restoration work done on trading cards.

    b.    After the Code of Conduct was published:

        i.     Defendant MASTRO, ALLEN, and others knowingly did not disclose to bidders material information about alterations of items sold by Mastro Auctions.

        ii.    Defendant MASTRO, ALLEN, and others knowingly did not disclose to bidders the extent and nature of restoration work performed on items sold by Mastro Auctions.

        iii.   Defendant MASTRO and ALLEN, along with others associated with Mastro Auctions, caused restoration work to be done on trading

cards sold by Mastro Auctions, and knowingly failed to disclose that work to bidders.

11. It was further part of the scheme that in marketing materials distributed on behalf of Mastro Auctions, which were intended to portray Mastro Auctions to potential bidders and consignors as a premier seller of valuable items for which a strong market existed, defendant MASTRO represented that Mastro Auctions had sold the most expensive baseball card in the world, a Honus Wagner T-206 card. In making this representation, however, defendant MASTRO knowingly omitted the material fact that defendant MASTRO had altered the baseball card by cutting the sides of the card in a manner that, if disclosed, would have significantly reduced the value of the card.

12. It was further part of the scheme that defendant MASTRO and ALLEN offered for sale items whose authenticity they knew to be materially misrepresented, including the following:

### Elvis Presley's Hair

a. On or about April 28, 2003, Mastro Auctions sold what it represented to be the hair of Elvis Presley ("the Purported Elvis Hair"). As a result of DNA testing performed on the Purported Elvis Hair after this sale, the authenticity of the item was called into question. In or about June 2004, after ALLEN learned of the DNA testing, ALLEN provided a refund to the purchasers of

the Purported Elvis Hair, and Mastro Auctions became the owner of the Purported Elvis Hair.

      b.    In or about December 2005, August 2006, April 2007, and August 2008, ALLEN sold, and caused to be sold, portions of the Purported Elvis Hair to Mastro Auction bidders. ALLEN knowingly caused false representations and material omissions to be made in each of the respective Auction House catalogs concerning the authenticity of the Purported Elvis Hair. For example, the Auction House represented that the Elvis Hair was "bona fide," that it would be sold with "documents attesting to the veracity" of the Elvis Hair, and that "short of comparing mitochondrial DNA with that of known Presley relatives, the hair . . . is . . . authentic."

**1869 Cincinnati Red Stockings Trophy Baseball**

      c.    In or around August 2002, Mastro Auctions sold what it represented to bidders as an 1869 Cincinnati Red Stockings trophy baseball to Purchaser A. At the time of the auction, Mastro Auctions had an ownership interest in the trophy ball. The 1869 Cincinnati Red Stockings Trophy Baseball was described, in part, as an actual game ball played with by the first professional team, decorated following the game, and presented to the winning team for display in the clubhouse. In or around October 2006, Purchaser A submitted the trophy ball to a laboratory for testing, the results of which indicated that the paint on the trophy ball contained a material not used in commercial paint until after World

16

War II, thus calling into question the authenticity of the trophy ball. In or around November 2006, after ALLEN learned of the laboratory results, ALLEN provided a refund to Purchaser A, and the trophy ball was returned to Mastro Auctions.

   d. In or about December 2006, defendant MASTRO contacted Victim A, and told Victim A that a lone 1869 trophy ball that was associated with a collection of trophy balls that Victim A had purchased from Mastro Auctions in or around August 2003 was available for sale. As defendant MASTRO well knew, the trophy ball he offered to Victim A was the same trophy ball that had been returned by Purchaser A due to concerns regarding its authenticity. Defendant MASTRO omitted this material information when he knowingly failed to inform Victim A about the laboratory results calling into question the authenticity of the trophy ball. On or about December 27, 2006, Victim A purchased the trophy ball from Mastro Auctions for approximately $62,000.

### Concealment of the Scheme

  13. It was further part of the scheme that defendant MASTRO, ALLEN, THEOTIKOS, and their co-schemers misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, the purposes of and acts done in furtherance of the scheme. In particular:

   a. At the close of each auction, defendant MASTRO, ALLEN, and THEOTIKOS caused "Auction Results" to be made available to customers, in which they falsely represented inflated auction results by stating that items had actually

17

sold, when in fact, as defendant MASTRO, ALLEN, and THEOTIKOS well knew, some of the items had not been sold at auction.

b. Defendant MASTRO, ALLEN, and THEOTIKOS caused materially false press releases to be issued following the auctions, which contained statements concerning auction sales that defendant MASTRO, ALLEN, and THEOTIKOS knew were materially false, including representations that certain items had been sold, when, as defendant MASTRO, ALLEN, and THEOTIKOS well knew, those items had not been sold.

c. Prior to July 2007, Mastro Auctions' bidding records were partially deleted and destroyed.

14. On or about May 20, 2002, at Oak Brook, in the Northern District of Illinois, Eastern Division,

WILLIAM MASTRO,

defendant herein, for the purpose of executing the aforesaid scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the Postal Service, an envelope addressed to Individual K.S., at an address in Maumee, Ohio, containing an invoice reflecting the sale of a 1942 John W. Davis jumbo campaign display badge and two 1960 John F. Kennedy and Richard Nixon cardboard campaign posters;

In violation of Title 18, United States Code, Sections 1341 and 2.

*Gary S. Shapiro /MSS*
UNITED STATES ATTORNEY